J. S33001/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ADOPTION OF S.B.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  T.K., SR., FATHER, | : | |
| | : | |
| Appellant | : | No. 166 EDA 2015 |

Appeal from the Decree, December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0057

| | | |
|---|---|---|
| IN RE:  ADOPTION OF B.J.L.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  T.K., SR., FATHER, | : | |
| | : | |
| Appellant | : | No. 173 EDA 2015 |

Appeal from the Decree, December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0058

| | | |
|---|---|---|
| IN RE:  ADOPTION OF K.F.L.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  T.K., SR., FATHER, | : | |
| | : | |
| Appellant | : | No. 179 EDA 2015 |

Appeal from the Decree, December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0059

J. S33001/15

IN RE:  ADOPTION OF T.L.K., JR.       :       IN THE SUPERIOR COURT OF
                                      :             PENNSYLVANIA
APPEAL OF:  T.K., SR., FATHER,        :
                                      :
                Appellant             :       No. 182 EDA 2015


Appeal from the Decree, December 10, 2014,
in the Court of Common Pleas of Montgomery County
Orphans' Court Division at No. 2014-A0060


BEFORE:  FORD ELLIOTT, P.J.E., DONOHUE AND LAZARUS, JJ.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:              **FILED JULY 10, 2015**

T.K., Sr. ("Father"), appeals the decrees terminating his parental rights to his four children pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b) of the Adoption Act.  After careful review, we affirm.

Father and A.W. ("Mother")[1] met in 2000 and over the course of six years had four children:  K.F.L.K. born in 2001; T.L.K., Jr. born in 2003; B.J.L.K. born in 2005; and S.B.K. born in 2006 ("the Children").  Father and Mother never married, and their relationship included several periods in which they lived together and several periods in which they were separated. From 2007 until 2011, Mother had primary custody of the Children except for K.F.L.K., who resided with Father.  During March or April of 2011, Father took custody of all the Children.  They remained with Father and his

---

[1] Mother has filed separate appeals from the decrees terminating her parental rights to the Children.

- 2 -

girlfriend until the Montgomery County Office of Children and Youth's ("OCY") involvement in March 2012. At that time, OCY began investigating an allegation that Father sexually abused K.F.L.K.

During the investigation, Father agreed to two different safety plans, first to have no unsupervised contact with his daughters, K.F.L.K. and B.J.L.K., and subsequently, no contact with them. During this time, the girls lived in Father's home in the care of his girlfriend. On April 16, 2012, the two girls were removed from the home after Father had contact with them in violation of the safety plan. On May 4, 2012, the boys, T.L.K., Jr. and S.B.K., were removed from Father's home after Father sent notes in their lunches to pass to the girls, after previously being instructed not to do so, in violation of the safety plan.

Based on its investigation, OCY determined that the allegations made by K.F.L.K. of sexual abuse by Father were credible and reported these allegations as "indicated" to the state registry, ChildLine. Father did not appeal this finding. Father was charged with sexual assault; however, all criminal charges were subsequently dropped in September of 2013.

In order to facilitate reunification with the Children, OCY created a family service plan ("FSP") for Mother and Father. Father's goals included: obtain stable housing and provide proof of financial ability to care for the Children; obtain drug and alcohol evaluation and follow all treatment recommendations; obtain a psycho-sexual evaluation and follow all

treatment recommendations; demonstrate an understanding of sexual abuse and its effects on children; resolve his legal issues and cooperate with OCY; follow the conditions of his bail; and if visits were reinstated, to demonstrate appropriate parenting boundaries. (Notes of testimony, 10/1/14 at 54.)

On April 8, 2014, OCY filed petitions to terminate Father's parental rights to the Children. Hearings were held on October 1, 2014, and November 12, 2014. OCY caseworker, Julia Solomon, testified that she was assigned the case in June of 2012. (*Id.* at 41.) Ms. Solomon testified that the court suspended Father's visitation with the Children after they were placed in foster care in May of 2012 due to Father's repeated violations of the safety plan and his refusal to follow orders not to have contact with the Children. (*Id.* at 51.) Ms. Solomon testified that Father was not very cooperative and was repeatedly confrontational with OCY. (*Id.* at 84.) She testified the vast majority of her communication with Father was received through his girlfriend. (*Id.*) She stated, "I had very infrequent contact with father, and he did not ask me about the children when he would contact me. (*Id.*)

Regarding Father's FSP goals, Ms. Solomon testified that he refused to comply with many of them, and that Father repeatedly stated that his attorney had instructed him not to complete certain things that OCY had asked him to do. (*Id.* at 84-85.) When asked about Father's housing status, Ms. Solomon replied that Father and his girlfriend maintained the

home they had when the Children were removed, and the girlfriend provided OCY with a copy of the lease. (*Id.* at 85-86.)

Regarding income and employment, Father's girlfriend provided some of the proof. (*Id.* at 86.) Father worked for a fencing company and had another job in general construction. (*Id.*)

From the outset of this case, Father was directed to obtain a drug and alcohol evaluation. He did not comply until November of 2013. The recommendations were for him to attend outpatient treatment, to attend groups, and also to attend individual drug and alcohol counseling on a weekly basis. (*Id.* at 94.) According to Ms. Solomon, Father only attended a few sessions. (*Id.*) Ms. Solomon testified that Father denied that he had any substance abuse problems. (*Id.* at 95.) Father acknowledged that he drank, but that was not a crime, and it was not an issue. (*Id.*)

Ms. Solomon testified that although Father's visits were suspended during the time she was assigned to the case, he did not assert himself to stay informed about the lives of his children or be involved as much as he could. (*Id.* at 96.)

Stephanie Setty, an OCY caseworker, testified that she was assigned the case in January of 2014. (*Id.* at 163.) Ms. Setty testified concerning Father's failure to provide urine screens within 24 hours of a request, despite being told that a failure to respond would be considered a positive test. According to her log, there were twelve 24-hour notices that Father failed to

respond to. (***Id.*** at 177.) Father did respond twice; one result came back negative but "diluted" and another came back negative. (***Id.*** at 177.)

Father testified he was advised by his criminal defense attorney not to participate in a psycho-sexual evaluation which had been requested by OCY while the criminal charges were pending. After the criminal charges were dropped in September of 2013, Father did take part in a psycho-sexual evaluation. While the evaluator, Barry Zakireh, Ph.D., found insufficient evidence that Father's behaviors "rise to the level of any specific sexual disorder or reflect severe, enduring, sexual, or highly frequent manifestations of sexual preoccupation, sexual obsessions or compulsive sexual behaviors," he did note other issues that were consistent with the observations and testimony of others. Those issues included "a history of aggression in a domestic context involving his ex-paramour," "evidence of abuse of alcohol and narcotic analgesics, which [Father] seems to downplay or underreport," and a "tendency to place himself in a favorable light and deny difficulties." (***See*** report of Dr. Barry Zakireh.)

Regarding the sexual assault allegations made by K.F.L.K. that were later dropped, the trial court made it clear that it "[could] not draw any conclusion regarding why the criminal charges were dropped. Nor was sufficient evidence presented to this Court to conclude whether the abuse occurred or not. Therefore, this Court will not make any determination that

depends upon whether or not the sexual abuse occurred." (Trial court opinion, 12/10/14 at 10.)

On December 10, 2014, the trial court granted the petitions to terminate Father's parental rights and entered final decrees. Father filed this timely appeal.

Father raises two issues for our consideration:

1. Whether the trial court committed an error of law and/or abuse of discretion when it held that OCY had proven by "clear and convincing evidence" that Father's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(2)?

2. Whether the trial court committed an error of law and/or abuse of discretion in concluding that changing the goal from reunification to adoption is best suited to the safety, protection and physical, mental, and moral welfare of the children, when reunification remains the most appropriate and feasible goal?

Father's brief at 5.

We review the termination of parental rights in accordance with the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***;

> ***In re: R.I.S.***, 36 A.3d [567,] 572 [(Pa. 2011)
> (plurality opinion)]. As has been often stated, an
> abuse of discretion does not result merely because
> the reviewing court might have reached a different
> conclusion. ***Id.*** [] Instead, a decision may be
> reversed for an abuse of discretion only upon
> demonstration of manifest unreasonableness,
> partiality, prejudice, bias, or ill-will. ***Id.***
>
> . . . . [E]ven where the facts could support an
> opposite result, as is often the case in dependency
> and termination cases, an appellate court must resist
> the urge to second guess the trial court and impose
> its own credibility determinations and judgment;
> instead we must defer to the trial judge[] so long as
> the factual findings are supported by the record and
> the court's legal conclusions are not the result of an
> error of law or an abuse of discretion. ***In re
> Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa.
> 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012) (citations

modified, some citations omitted). It is well settled that a party seeking

termination of a parent's rights bears the burden of proving the grounds by

clear and convincing evidence, a standard that requires evidence that is "so

clear, direct, weighty, and convincing as to enable the trier of fact to come

to a clear conviction, without hesitance, of the truth of the precise facts in

issue." ***In re T.F.***, 847 A.2d 738, 742 (Pa.Super. 2004) (citation omitted).

We believe the record contains sufficient evidence to support the

termination of Father's parental rights pursuant to 23 Pa.C.S.A.

§ 2511(a)(2). In order to terminate parental rights pursuant to

Section 2511(a)(2), three elements must be met: (1) repeated and

continued incapacity, abuse, neglect, or refusal; (2) such incapacity, abuse,

neglect, or refusal caused the child to be without essential parental care, control, or subsistence; and (3) the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citations omitted).

Our supreme court has explained our inquiry under Section 2511(a)(2) as follows:

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." If and only if grounds for termination are established under subsection (a), does a court consider "the developmental, physical and emotional needs and welfare of the child" under § 2511(b).
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d at 827 (citation omitted).

Instantly, Father asserts that the criminal charges filed against him impeded his ability to fully comply with OCY. He further contends that the steps he has taken since his criminal case was withdrawn warranted further deference from the court. (Father's brief at 9.) That is the total of Father's argument to this court. We cannot grant Father relief on his claim.

As already stated, Father's children were removed in April and May of 2012 and were placed in foster care. Father's criminal case was withdrawn in September of 2013. Father would have us ignore the 16 months between May of 2012 and September of 2013 where he did very little to resolve the issues of his parental incapacity. This court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Father claims that his impending criminal charges impeded his ability to fully comply with OCY. We find that assertion disingenuous. Initially, Father was not permitted to see the Children because of his failure to follow the safety plan. The filing of criminal charges also prevented Father from having contact with the Children. However, there was no bar to Father contacting OCY to inquire as to the Children's well-being. The OCY

caseworkers testified that it was Father's girlfriend who spoke with them about the Children, and not Father.

OCY Caseworker Solomon testified that at a meeting on December 18, 2013, Father was "very confrontational with all staff members present, and he, you know, repeatedly denied he needed to do these things." (Notes of testimony, 10/1/14 at 92-93.) She was referring to giving a urine sample which Father was ordered to provide. Additionally, while Father eventually obtained drug and alcohol evaluations, he failed to attend counseling sessions. He consistently maintained he never had a drinking problem. (Notes of testimony, 11/12/13 at 193.)

The record belies Father's assertion that he did not have a drinking problem. Diana Rosenstein, Ph.D., an expert in psychology, psychoanalysis, and bonding and attachment assessments among children, parents, and other caregivers, testified that she performed assessments of the parenting capacity of each of the birth parents, and an evaluation of each of the Children to each birth parent. Dr. Rosenstein testified that all four children had observed Father abuse alcohol and stated that Father became "mean," "violent," or "physical" when he was drinking. All four children mentioned his drinking and the frightening effect it had on them. (*Id.* at 44-46.) The Children also mentioned incidents of violence between Father and his girlfriend. (*Id.* at 45.) Dr. Rosenstein stated, "I found all four of the

children to be credible in their description of the father's alcohol abuse." (***Id.*** at 47.)

In her testimony, Mother described acts of violence perpetrated against her by Father when he was drunk, such as, punching her in the face, and pinning her against a wall and choking her. (***Id.*** at 148.) Mother testified that the Children had witnessed one of the physical altercations between herself and Father. (***Id.*** at 150.)

Father's girlfriend, while denying he had an alcohol abuse problem, described an incident where Father was arrested because he was drinking and depressed that he did not have a job at the time. (***Id.*** at 241.)

Additionally, Father's repeated failure to provide urine screens within 24 hours upon request, despite being advised that a failure to respond would be considered a positive test, infers he feared a positive test result.

The above evidence clearly contradicts Father's statements that he did not have a drinking problem and raises concerns about Father's reliability as a witness. Along with Father's alcohol abuse was a history of domestic violence that clearly had an effect on the Children. The clear and convincing evidence of record confirms the trial court's determination that "Father's alcohol use and history of domestic violence, as well [as] his inability to meet the emotional needs of the children, creates a parental incapacity that prevents him from providing a safe and secure home for the children." (Trial court opinion, 12/10/14 at 17.) Accordingly, we conclude the record

evidence supports the termination of Father's parental rights under Section 2511(a)(2).

After we determine that the requirements of Section 2511(a) are satisfied, we proceed to review whether the requirements of Subsection (b) are satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*) (providing that, once a court determines that the parent's conduct warrants termination of his or her parental rights pursuant to Section 2511(a), the court then conducts the second part of the analysis, pursuant to Section 2511(b), to determine "the needs and welfare of the child under the standard of best interests of the child."). This court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under Section 2511(b), we consider whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa.Super. 2005), *appeal denied*, *sub nom. C.M.S. v. D.E.H., Jr.*, 897 A.2d 1183 (Pa. 2006). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, with

utmost attention to the effect on the child of permanently severing that bond." *Id.* at 1287 (citation omitted).

We note Father has failed to present an argument regarding Section 2511(b). Suffice it to say, the trial court has addressed this section, and we conclude its analysis that the termination of Father's parental rights will best serve the needs and welfare of the Children is supported by the record.

Father's remaining issue concerns whether the trial court abused its discretion when it approved a change of goal from reunification to adoption. According to Father, the facts and circumstances of this case do not support the goal change. On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. *Id.* The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm "even if the record could also support an opposite result."

*Id.* at 822-823 (internal citations omitted).

This matter is controlled by the Juvenile Act, 42 Pa.C.S.A. § 6301. When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa.Super. 2007), citing 42 Pa.C.S.A. § 6351(f).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . . .
>
> (2)  If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

On the issue of a placement goal change, this court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. ***See In re Sweeney***, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." ***In re E.F.V.***, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

***In re K.C.***, 903 A.2d 12, 14-15 (Pa.Super. 2006).

Instantly, after careful review of the record, we discern no abuse of discretion by the trial court. The crux of Father's argument is that he had essentially alleviated the circumstances, *i.e.*, the allegations of sexual abuse, which led to placement of the Children. (Father's brief at 11.) Father contends because the criminal charges were not pursued and Dr. Zakireh concluded there was insufficient evidence to establish Father sexually assaulted the victim in this case, that the trial court should have maintained reunification as the goal and directed OCY to provide more services to Father. (*Id.*)

As previously discussed, the trial court could not draw any conclusion regarding why the criminal charges were dropped. As such, the court

declined to consider whether the sexual abuse occurred when making its determination. Clearly, Father ignores the other factors which prevented him from retaining custody of the Children, such as: Father repeatedly ignored OCY's safety plans which caused his two sons to be removed from his home; he failed to cooperate and was confrontational with OCY staff; he failed to attend counseling sessions; he failed to admit he had a drinking problem; he failed to produce urine screens at least 15 times when called upon to do so; all four children told Dr. Rosenstein that Father's drinking had a frightening effect on them (**see** notes of testimony, 11/12/14 at 44-46). Based on the entire record, we find the trial court correctly determined that continued placement was best suited to the safety, protection, physical, mental, and moral welfare of the Children. Accordingly, we affirm.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2015